## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

STIMSON LUMBER COMPANY,
an Oregon corporation,                                    CV 10-79-M-DWM-JCL

                                    Plaintiff,

              vs.                                         FINDINGS AND
                                                          RECOMMENDATION OF
INTERNATIONAL PAPER                                       U.S. MAGISTRATE JUDGE
COMPANY, a New York corporation,

                                    Defendant.

_____

Plaintiff Stimson Lumber Company ("Stimson") brings this cost recovery

and contribution action under the federal Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et

seq., and its state law counterpart, seeking reimbursement from Defendant

International Paper Company ("International Paper") for past and future response

and remediation costs associated with the cleanup of hazardous chemicals at the

Bonner Mill site in Bonner, Montana.  International Paper moves for summary

judgment on the ground that Stimson's claims are barred by the terms of two prior

contractual agreements allocating environmental responsibilities between the

parties.  Alternatively, International Paper moves for summary judgment to the

extent Stimson seeks to hold it jointly and severally liable for any and all cleanup

costs.

For the reasons set forth below, International Paper's threshold motion for summary judgment that Stimson's claims are barred by contract should be denied, and its alternative motion for summary judgment on Stimson's claims of joint and several liability should be granted.

## I.    Background

Stimson is the current owner of a former sawmill and plywood manufacturing plant ("Bonner Mill" or "site") located along the southern bank of the Blackfoot River in Bonner, Montana.  Simpson purchased the Bonner Mill from International Paper's predecessor, Champion International Company, in 1993.[1]  The parties memorialized their transaction in an Asset Purchase and Sale Agreement dated September 2, 1993 ("1993 Agreement").  Stimson operated the Bonner Mill from 1993 until it shut down in 2008.

In July 2002 and August 2003, Stimson sent International Paper notice of indemnification claims related to costs incurred for cleaning up contamination in the Bonner Mill's Fire Pond Lagoon and east log yard gate area.  Dkt. 37-7, 37-8.  In October 2005, Stimson and International Paper entered into a General Release

---

[1]  Because Champion International Company was International Paper's predecessor in interest, the Court will refer to the two entities interchangeably as "International Paper."

and Settlement Agreement ("2005 Agreement") resolving Stimson's indemnification claims.  Dkt. 37-9.

Sometime the next year, in 2006, environmental testing of a cooling pond at the site revealed polychlorinated biphenyls ("PCBs") in the pond's sediment and berm at concentrations that exceeded applicable screening levels.  The Montana Department of Environmental Quality subsequently notified Stimson that it would be required to clean up the contamination in the cooling pond area.  In April 2010, Stimson entered into an Administrative Order on Consent with the Montana Department of Environmental Quality, pursuant to which it agreed to remove and dispose of contaminated materials in and around the cooling pond.  Dkt. 37-2, ¶¶ 29, 74.   Stimson also agreed to restore the Blackfoot River bank and floodplain, and to reimburse the state of Montana for its past and future remedial action costs. Dkt. 37-2, ¶¶ 74, 101-02 .

Some three months later, Stimson commenced this action against International Paper in an effort to recover the response and remedial actions costs it has incurred, and will continue to incur, in cleaning up the contamination in and around the cooling pond.  Stimson alleges that when International Paper owned the site, it "used equipment, including hydraulic pumps and transformers, that contained PCBs," and that "malfunctions and leaks of that equipment caused

releases of PCBs" into the environment on the Site."  Dkt. 1, ¶ 12.  Stimson seeks

both cost recovery and contribution from International Paper under §§ 107(a) and

113(f) of CERCLA, and under the Montana Comprehensive Environmental

Cleanup and Responsibility Act ("CECRA"), Mont. Code Ann. §§ 75-10-701 et

seq.  Dkt. 1, ¶¶ 20-40.  Stimson also seeks a declaratory judgment holding

International Paper jointly and severally liable under CERCLA and CECRA for

past and future response and remedial action costs, including prejudgment interest.

Dkt. ¶¶ 41-49.   International Paper has answered and counterclaimed for

contribution under CERCLA § 113(f) and CECRA § 75-10-724.  Dkt. 54.

International Paper moves for summary judgment on the ground that

Stimson's claims are barred by the terms of the 1993 and 2005 Agreements, both

of which allocate certain environmental responsibilities between the parties.

Alternatively, International Paper seeks summary judgment to the extent Stimson

seeks to hold it jointly and severally liable for the cost of cleaning up the

contamination at the cooling pond.

## II.    Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary

judgment "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  The party seeking

summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255;

5

*Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III.   Discussion

### A.   Motion for Summary Judgment that Stimson's Claims are Barred by Contract

International Paper argues it is entitled to judgment as a matter of law because Stimson previously agreed to accept full responsibility for all environmental issues at the Bonner Mill, including the PCB contamination giving rise to this litigation.  According to International Paper, evidence that Stimson has assumed all environmental liabilities at the site can be found in both the 1993 Agreement and 2005 Agreement.  As International Paper reads them, either one of these contracts is sufficient to bar Stimson from pursuing its current claims for cost recovery and contribution under CERCLA and CECRA.

It is well-established that parties are "free to enter into private contractual arrangements" for purposes of allocating among themselves the financial burden of any potential CERCLA cleanup liability.  *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.,* 973 F.2d 688, 692 (9th Cir. 1992) (citing *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir. 1986)).  CERCLA specifically contemplates the use of indemnification agreements for this purpose. 42 U.S.C. § 9607(e)(1).  In the typical CERCLA indemnification agreement, "one party agrees to reimburse another party for response costs associated with the

6

clean-up of hazardous substance contamination." *U.S. v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1233, 1242 n. 16 (E.D. Cal. 1997).  While such an indemnification agreement may effectively provide for a shifting of cleanup costs, it does not operate to relieve a party of its underlying CERCLA liability." *City and County of Honolulu v. Churchill*, 167 F. Supp. 2d 1143, 1150 (D. Haw. 2000).

The Ninth Circuit has made clear that courts are to apply state law when interpreting contractual agreements allocating the financial burden of CERCLA liability.  *See Mardan*, 804 F.2d at 1458-59.   The parties agree that this Court must look to Montana law to inform its reading of the 1993 Agreement, and to New York law for purposes of construing the 2005 Agreement.  Dkt. 50-1, § 21.3(c); 37-9, ¶ 9.  The guiding principles of contract law are fundamentally the same in both states.

Among those principles is the notion that when "the language of an agreement is clear and unambiguous, and as a result, susceptible to only one interpretation, the court's duty is to apply the language as written." *Rich v. Ellingson*, 174 P.3d 491, 495 (Mont. 2007); *see also South Road Associates, LLC v. International Business Machines Corporation*, 4 N.Y.3d 272, 277 (2005).  The court is to "give effect to the 'mutual intention of the parties' as it existed at the time the contract was made, so long as that intention is 'ascertainable and lawful.'"

*K&R Partnership v. City of Whitefish*, 189 P.3d 593, 600 (Mont. 2008) (quoting

Mont. Code Ann. § 28-3-202).  To that end, the court must read the contract as a

whole, giving "effect to every part if reasonably practicable, each clause helping to

interpret the other."  *K&R Partnership v. City of Whitefish*, 189 P.3d 593, 600

(Mont. 2008) (quoting Mont. Code Ann. § 28-3-202); *see also Williams Press,*

*Inc. v. State*, 335 N.E.2d 299, 302 (1975).  If the terms of a contract are clear, "the

court must determine the intent of the parties from the wording of the contract

alone."  *Rich*, 174 P.3d at 495; *see also Koren Rogers Associates Inc. v. Standard*

*Microsystems Corp.*, — N.Y.S.2d —, 2010 WL 5290124 (N.Y.A.D. 1 Dept.,

2010).

Only if the contract is ambiguous "may the court turn to extrinsic evidence

of contemporaneous or prior oral agreements to determine the intent of the

parties."  *Rich*, 174 P.3d at 495; *see also RJE Corp. v. Northville Indus. Corp.*, 329

F.3d 310, 314 (2d Cir. 2003).  An ambiguity can be said to exist "where the

language of the contract, as a whole, could reasonably be subject to two different

meanings."  *Czajkowski v. Meyers*, 172 P.3d 94, 99 (Mont. 2007); *see also Bana*

*Elec. Corp. v. Bethpage Union Free School Dist.*, 73 A.D.3d 987, 988 (2010).  The

fact that the parties may "disagree as to the meaning of a contract provision does

not necessarily create an ambiguity."  *Czajkowski*, 172 P.3d at 99.  Whether a

contract is ambiguous is a question of law for the court to resolve.  *K&R Partnership v. City of* Whitefish, 189 P.3d 593, 600 (Mont. 2008); *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (1990).

It is with these principles in mind that the Court turns now to the question of whether the parties have done what International Paper claims they have, and contractually shifted financial responsibility to Stimson for the environmental liabilities giving rise to this litigation.

### 1.   1993 Purchase and Sale Agreement

International Paper maintains the purchase and sale agreement for the Bonner Mill unambiguously provided that, ten years after the closing date, Stimson would assume all liability for environmental cleanup costs at the site, including any potential CERCLA liability for unknown environmental contamination.  According to International Paper, unambiguous evidence that the parties intended for the risk of CERCLA liability to shift to Stimson after ten years can be found in the 1993 Agreement's "Limitations of Warranties – AS IS Clause" and various indemnification provisions.

### a.   *Limitations of Warranties - "AS IS" Clause*

International Paper first argues that Stimson assumed financial responsibility for any and all CERCLA liability because it agreed to purchase the

Bonner Mill "as is," subject only to certain express warranties. The 1993

Agreement contains a "Limitations of Warranties – AS IS clause," which reads, in

pertinent part, as follows:

> Except for the express warranties made in Section 3, Buyer accepts the
> Division Assets "AS IS" in their present condition based solely upon
> Buyer's own inspection and determination as to value and not based upon
> any expressed or implied representation or warranty by Seller....

Dkt. 50-1, ¶ 6.

International Paper argues that this "as is" clause was sufficient to

effectively release it from any environmental liability at the site, and transfer that

liability to Stimson.  For support, International Paper relies on two out of

jurisdiction cases for the proposition that parties can contractually transfer

financial responsibility for environmental liabilities simply by using an "as is"

clause. *See Niecko v. Emro Marketing Co.*, 973 F.2d 1296, 1299-01 (6th Cir.

1992); *Velsicol Chemical Corp. v. Reilly Indus.*, 67 F.Supp.2d 893, 905 (E.D.

Tenn. 1999).  But because the contractual provisions at issue in *Niecko* and

*Velsicol* were substantively different from those at issue here, the two cases are

inapposite.

In *Niecko,* the parties expressly agreed that the seller made no warranties

that the property complied with federal, state, or local laws or regulations, and the

buyer took "the property in its existing condition with no warranties of any

10

kind...." *Niecko*, 973 F.2d at 1299.  Additionally, the purchase agreement

specifically stated that the buyer, who was purchasing the property "as is," agreed

to "assume[] all responsibility for any damages caused by the conditions on the

property upon transfer of title." *Niecko*, 973 F.2d at 1299.  Noting that the buyer

expressly agreed to assume liability for conditions on the property, the Sixth

Circuit reasonably found that the seller had done more than simply disclaim any

warranties and had effectively transferred liability for the cost of environmental

cleanup to the buyer.  *Niecko*, 973 F.2d at 1300.

　　　Here, however, the 1993 Agreement's "Limitations of Warranties – AS IS

Clause" does just what it purports to, and nothing more.  There is no comparable

language suggesting that Stimson agreed to assume liability for conditions on the

property.  And unlike the seller in *Niecko*, International Paper made several

express warranties, including a number relating to environmental matters.  Dkt.

50-1, ¶ 3.11.  In fact, International Paper expressly warranted that in the conduct

of its business prior to closing, it was "in compliance with, and not in violation of,

any of the terms or conditions of...any Environmental Law," including CERCLA.[2]

Dkt. 50-1, ¶ 3.11(b).  Stimson only agreed to accept the Bonner Mill property "as

is" subject to that express environmental warranty and several others.

---

　　[2] The 1993 Agreement defines "Environmental Laws" to mean "all applicable
federal, state or local laws..," including CERCLA.  Dkt. 50-1, ¶ 1(k).

11

*Velsicol* is also distinguishable.  While the court in that case concluded that a buyer who purchased property "as is" had assumed all liability relating to the environmental condition of the property, it did so only after a bench trial during which it considered extrinsic evidence of the parties' intent.  *Velsicol,* 67 F.Supp.2d at 906-07.

Unlike *Velsicol,* it is evident from the face of the "Limitations of Warranties – AS IS Clause" at issue here that Stimson did not agree to accept all environmental liability relating to the condition of the Bonner Mill.  The clause specifically excepts the several environmental warranties set forth in Section 3 of the 1993 Agreement, and International Paper agreed to indemnify Stimson for many environmental matters.  Dkt. 50-1, ¶ 13.2(e) & Schedule 3.11.  To read the Limitations and Warranties clause as International Paper suggests, and hold that it effectively transferred all environmental liability to Stimson, would be to render those environmental warranties and indemnification provisions meaningless.

> b.   *Indemnification provisions*

International Paper also argues that under the 1993 Agreement, and particularly the indemnification provisions, all liability for environmental conditions at the Bonner Mill – both known and unknown – shifted to Stimson ten years after the closing date.

Paragraph 13.2, titled "Indemnifications by Seller," sets forth the several matters for which International Paper agreed to indemnify Stimson.  Dkt. 50-1, ¶ 13.2.  For example, International Paper agreed to indemnify Stimson for any material breach of its various representations and warranties.  Dkt. 50-1, ¶ 13.2(a).  International Paper also agreed to indemnify Stimson for claims relating to various environmental matters, including those arising out of the "presence (at levels or concentrations that would require remedial or corrective action under any environmental law) of any solid toxic, hazardous, industrial or chemical wastes" resulting from the use of the Bonner Mill site prior to the closing date.  Dkt. 50-1, ¶ 13.2(e)(ii).  Paragraph 13.2 specifically addresses CERCLA as well, with International Paper agreeing to indemnify Stimson for "[c]laims for environmental cleanups under any federal, state, or local law...including but not limited to" CERCLA.  Dkt. 50-1, ¶ 13.2(e)(v).

While International Paper thus agreed to indemnify Stimson for the sort of CERCLA and CECRA claims advanced here, International Paper contends that the period of indemnity provided for by Section 13.2 expired on November 1, 2003 – ten years after the closing date, and well before Stimson initiated this litigation.  Once that period of indemnity expired, International Paper maintains, the financial burden of any potential liability under CERCLA and CECRA shifted to Stimson.

13

As International Paper views it, Stimson effectively assumed liability for all CERCLA-type losses when those indemnification obligations expired, and is therefore barred from pursuing its current cost recovery and contribution claims.

Stimson disagrees, arguing as a threshold matter that International Paper's indemnification obligations under the 1993 Agreement are ongoing. If Stimson is correct in its assertion that International Paper is still obligated by contract to indemnify Stimson for all CERCLA-type losses, then International Paper would not be entitled to summary judgment.

To determine whether or not International Paper's contractual indemnification obligations have in fact expired, the Court looks to the terms of the contract itself. As noted above, International Paper's various indemnification obligations are set forth in Paragraph 13.2(a)-(e), and include a commitment to indemnify Stimson for CERCLA and many other environmental matters. Immediately following this litany of indemnification obligations, Paragraph 13.2(f) states, in its entirety, as follows: "Notwithstanding the foregoing, Seller's obligations to indemnify Buyer hereunder are subject to the time periods and notice provisions of paragraph 5.1." Dkt. 50-1, ¶ 13.2(f).

Paragraph 5.1 in turn provides:

**5.    <u>Survival of Representations and Warranties</u>.**

14

> **5.1** __Survival.__  The respective representations and warranties of
> Seller and of Buyer contained herein or in any Schedule...delivered by
> or on behalf of such party pursuant to this Agreement and not relating
> to environmental matters shall survive the Closing for a period of two
> (2) years and thereafter shall expire and terminate....  Representations
> and warranties of Seller relating to [environmental matters][3] in
> paragraph 3.11 survive the Closing for a period of ten (10) years and
> thereafter shall expire and terminate except as to matters for which
> Buyer has provided notice to Seller of the inaccuracy or breach of
> such representations or warranties, and in paragraph 8 shall survive
> the Closing indefinitely.

Dkt. 50-1, ¶ 5.1.

Read in conjunction with one another, Paragraphs 5.1 and 13.2 are clear.

Paragraph 5.1 contemplates two distinct time periods – one lasting two years and

another lasting ten.  Paragraph 13.2(f) states that those time periods apply to the

"foregoing" indemnification obligations set forth in Paragraph 13.2(a)-(e), which

include International Paper's obligation to indemnify Stimson for CERCLA-type

liability.  The ten-year period relating to environmental matters thus governs

International Paper's environmental indemnification obligations.  Because Closing

took place in November 1993, those contractual obligations expired and

terminated in November 2003.

---

[3]  As the result of an apparent typographical error, Paragraph 5.1 is missing a
word or phrase in the spot where the Court has inserted this bracketed text.
Because the parties agree that this sentence relates to "environmental matters," the
Court has inserted this bracketed text accordingly. *See e.g.* Dkt. 49 at 6-7; 56 at 6
n. 1.

Notwithstanding the clarity with which the 1993 Agreement limits the duration of International Paper's contractual indemnification obligations, Stimson urges a different reading on the Court.  Pointing to the fact that Paragraph 5 is titled "Survival of Representations and Warranties," Stimson argues that the time periods set forth in Paragraph 5.1 apply only to breaches of representations and warranties, and have no effect on the duration of International Paper's indemnification obligations.  Stimson maintains that additional support for this reading can be found in the text of Paragraph 5.1, which refers only to "[t]he respective representations and warranties of Seller and of Buyer," and says nothing about indemnification.  Stimson therefore believes it would be more reasonable to read Paragraph 13.2(f) as making Paragraph 5.1's two and ten-year time periods applicable only to those indemnification obligations relating to breaches of representations and warranties.[4]

But to read Paragraph 13.2(f) as applying only to the representations and warranties in subparagraph (a) would be to disregard its plain text.  Paragraph 13.2(f) clearly states that International Paper's "obligations to indemnify

---

[4] Those obligations are set forth in Paragraph 13.2(a), which requires that International Paper indemnify Stimson for any material breach "of any of its representations, warranties, covenants or agreements made in or pursuant to this Agreement or the attachments, exhibits or Schedules hereto...."  Dkt. 50-1, ¶ 13.2(a).

[Stimson] hereunder are subject to the time periods and notice provisions of paragraph 5.1."  Dkt. 50-1, ¶ 13.2(f).  Stimson simply cannot overcome the directive set forth in Paragraph 13.2(f), which makes Paragraph 5.1's ten-year time period applicable to International Paper's contractual duty to indemnify Stimson for CERCLA-related liability.   That ten-year time period expired in November 2003 – nearly seven years before Stimson commenced this litigation.

In a final effort to exempt its claims from the time periods set forth in Paragraph 5.1, Stimson suggests that some of the indemnification provisions set forth in Schedule 3.11 "may apply to the cleanup of the Cooling Pond in this case." Dkt. 49, at 9.   Schedule 3.11's indemnification provisions were "intended to meet [Stimson's] concerns with respect to known conditions" at the Bonner Mill, and were expressly exempted from the time periods set forth in Paragraph 5.1.  Dkt. 50-1, at 34.  Stimson maintains that the following indemnity provisions are relevant, and may apply to its claims: (1) Unpermitted Noncontact Cooling Water Discharges; (2) Scrubber Water Discharges to Bonner Cooling Ponds; (3) Hydraulic Fluid Leakage, and; (4) Leakage in Drum Storage Area.  Dkt. 50-1, at 37 (Schedule 3.11(d)(2),(3),(5)&(6)).

While Stimson suggests these provisions "may" apply to the cleanup of the cooling pond, it offers little in the way of argument to show that this is so.   The

17

parties drafted Schedule 3.11 for the express purpose of addressing environmental conditions that were "known" at the time of closing, and setting forth International Paper's "plans and procedures" for correcting those problems.   Dkt. 50-1, ¶ 3.11(f).   Schedule 3.11 does not address the PCB contamination that lies at the root of this litigation because that contamination did not come to light until 2006, when environmental testing revealed unacceptably high concentrations of PCBs in the cooling pond.  Significantly, Stimson's Complaint does not allege a claim for indemnification under Schedule 3.11.  As pled, Stimson's only claims are for cost recovery and contribution under CERCLA and CECRA.

The question, then, is whether Stimson is precluded from pursuing those statutory claims by virtue of the fact that International Paper's contractual indemnification obligations have expired.  International Paper takes the position that Stimson's claims are indeed barred, arguing that any liability it might have had under CERCLA and CECRA effectively shifted to Stimson when the ten-year indemnity period expired.  International Paper maintains it is clear from the face of the 1993 Agreement that the parties intended for Stimson to assume all environmental liabilities at the site, including any CERCLA and CECRA liabilities, once International Paper's indemnity obligations expired.

It undisputed that the 1993 Agreement does not contain any express

18

language to that effect.  Nowhere do the parties state that Stimson was to assume International Paper's statutory environmental liabilities when the ten-year indemnification period came to a close.  In fact, several provisions of the 1993 Agreement's provisions run counter to such a conclusion.

At the outset, the 1993 Agreement's base price clause cautions that Stimson "shall not assume or be responsible for any liabilities or obligations" of International Paper.  Consistent with this statement, the contract also contains an integration clause, which provides as follows:

> **21.2   Integration.**    This Agreement and the documents delivered pursuant hereto contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior negotiations.  None of the parties shall be bound by nor shall be deemed to have made any representations, warranties or commitments except those required to be made by the terms of this Agreement, or those which are contained herein or in the documents delivered pursuant hereto.

International Paper minimizes the significance of this integration clause, claiming it "provides only that the written agreement constitutes the entire agreement of the parties 'and supersedes all prior negotiations.'" Dkt. 56, at 9. But the clause does more than that, expressly stating that neither party can be said to have made any "representations" or "commitments" except for those set forth in the 1993 Agreement.  The 1993 Agreement does not contain any representation or commitment on Stimson's part to assume International Paper's statutory

environmental liabilities ten years after closing.

This omission is particularly glaring in light of the fact that the parties expressly enumerated the matters for which Stimson agreed to indemnify International Paper.  Stimson agreed, for example, to indemnify International Paper for:

> [a]ny claims by third parties or any fines or penalties for violations of law and obligations imposed by laws, including, but not limited to, any Environmental Laws and any Environmental Liabilities arising out of the operation or ownership of the Division Assets by [Stimson] after the Closing Date and for which the events giving rise to the claim occurred after Closing."

Dkt. 50-1, ¶ 13.3.

That the parties thought to include a provision pursuant to which Stimson made clear its intent to assume responsibility for environmental obligations arising out of events taking place after the closing date reasonably suggests that they would have included a comparable provision had they likewise intended for Stimson to assume responsibility for unknown environmental obligations arising out of events taking place prior to the closing date, once the ten year indemnity period expired.   There is no such comparable provision, however, and no language in any other portion of the 1993 Agreement by which Stimson expressly assumed International Paper's environmental liabilities.

Not to be deterred, International Paper takes the position that an express

20

assumption is not necessary, and would be redundant of the "Limitations of Warranties -AS IS Clause" and indemnification provisions – which it views as having automatically transferred all CERCLA and CECRA liability at the site to Stimson.  For support, International Paper relies on *Armotek Industries, Inc. v. Freedman*, 790 F.Supp. 383, 392 (D. Conn. 1992), and *Keywell v. Weinstein*, 33 F.3d 159, 165 (2d Cir. 1992), both of which it claims stand for the proposition that when an indemnity clause covering CERCLA-type environmental liability expires, that liability effectively transfers to the indemnitee.  Likening this case to *Armotek* and *Keywell*, International Paper argues that the 1993 Agreement unambiguously allocated liability for CERCLA-type losses to Stimson, effective in November 2003.  But because *Keywell* and *Armotek* are both distinguishable, they are of little help here.

In *Armotek*, the parties entered a purchase agreement pursuant to which the seller represented and warranted that it was in compliance with all environmental laws and regulations.  *Armotek*, 790 F. Supp. at 384.  The seller agreed to indemnify the buyer for any breach of those representations and warranties for a period of three years after the sale of the property.  *Armotek*, 790 F. Supp. at 384.  After the indemnity period expired, the buyer incurred environmental cleanup costs, and sought to recover those costs from the seller.  *Armotek*, 790 F. Supp. at

385.   The court concluded that those claims were barred, however, because the risk of environmental liability had shifted to the buyer upon the expiration of the contractual indemnity period.  *Armotek*, 790 F.Supp. at 392.

Unlike the 1993 Agreement at issue here, however, the purchase agreement in *Armotek* specifically provided that "'no claim for indemnification' resulting from environmental liabilities could be made against the seller" after the contractual period of indemnity expired.   *Armotek*, 790 F. Supp. at 392.  Based on that language, the *Armotek* court reasonably concluded that the parties had effectively transferred liability under CERCLA to the buyer after the indemnity period expired.  *Armotek*, 790 F. Supp. 392.   Because there is no similar provision in the 1993 Agreement, *Armotek* is inapposite.

*Keywell* is no more persuasive.  The parties in *Keywell* also entered a purchase agreement pursuant to which the seller explicitly represented and warranted that it was in compliance with all environmental laws, and in doing so "effectively warrant[ed] that there ha[d] been no violations of CERCLA" at the site.  *Keywell*, 33 F.3d at 165.  The purchase agreement stated that those representations and warranties were to survive the closing for a period of two years, and individual members of the seller's management group agreed to indemnify the buyer for any breach of warranty or representation that might "come

22

to light within two years after the closing." *Keywell*, 33 F.3d at 165. The

corporate seller executed a contemporaneous indemnity agreement pursuant to

which it agreed to indemnify the buyer "for thirty years from any loss resulting

from circumstances existing at the time the Purchase Agreement was signed."

*Keywell*, 33 F.3d at 166.

Before the representations and warranties were due to expire, various

disputes arose between the buyer and individual members of the seller's former

management group. *Keywell*, 33 F.3d at 162. The parties resolved those disputes,

and the buyer unconditionally released the individual managers from any claims,

liabilities, and causes of action it might have had under the purchase agreement.

*Keywell*, 33 F.3d at 162. After the release was executed, the buyer learned that the

seller had disposed of hazardous waste at the site and thereafter entered into an

agreement with the state to institute a comprehensive clean-up plan. *Keywell*, 33

F.3d at 162. The buyer filed suit seeking to hold the individual managers strictly

liable for cleanup costs under CERCLA. *Keywell*, 33 F.3d at 162.

The Second Circuit held that the buyer's CERCLA claims were barred on

the ground that "[t]he Purchase Agreement and the contemporaneous Indemnity

Agreement unambiguously allocate[d] to [the buyer] the risk of CERCLA losses

after the expiration of the indemnification period." *Keywell*, 33 F.3d at 165.

23

Although it was not critical to the *Keywell* court's holding, it is significant to this Court that the buyer had expressly released the individual managers from any claims it might have had under the purchase agreement, thereby evidencing an intent to release those individuals from any CERCLA liability.  In view of the fact that the buyer expressly released the individual managers, it was safe to say it had effectively assumed responsibility for any CERCLA liability those individuals might have faced.   There is no similar release in this case.  Also, there is no way to determine from the face of the *Keywell* opinion whether the purchase and indemnity agreements contained an integration clause like the one at issue here, or any language stating that the buyer was not to assume or be responsible for any of the seller's liabilities or obligations.

       As discussed above, the 1993 Agreement states that Stimson would "not assume or be responsible for any liabilities or obligations of" International Paper, and provides that neither party would be deemed to have made any representations or commitments except for those set forth therein.  Dkt. 50-1, ¶¶ 2.1, 21.2. Reading the 1993 Agreement as whole and giving effect to all of its provisions, the Court cannot say as a matter of law that the parties clearly intended for Stimson to assume International Paper's statutory environmental liabilities when the contractual indemnification obligations set forth in Paragraph 13.2(e) expired.

International Paper has thus fallen short of satisfying its threshold burden as the party moving for summary judgment.  Accordingly, to the extent that International Paper moves to summarily dismiss Stimson's claims on the ground that they are barred by the 1993 Agreement, its motion should be denied.

2.    2005 General Release and Settlement Agreement

In October 2005, the parties entered a General Release and Settlement Agreement resolving two claims for indemnification submitted by Stimson several years after closing on the Bonner Mill property, but before the ten-year indemnity period expired.  International Paper moves for summary judgment on the additional ground that Stimson's CERCLA and CECRA claims are barred by what it characterizes as the "broad language" of this 2005 Agreement.  Dkt. 35, at 17.

The 2005 Agreement's introductory language explains that Stimson and International Paper had become embroiled in a dispute, and "the parties hereto desire to resolve the Dispute by and between themselves."  Dkt. 37-9, at 2.   The 2005 Agreement defines that Dispute as follows:

> WHEREAS, a dispute arose between Stimson and IP with respect to indemnification claims made by Stimson concerning the presence of petroleum products and hydrocarbons on and under the Mill property, and for past handling of hazardous and/or solid waste generated at the Bonner Mill in Bonner, Montana (the "Dispute").

Dkt. 37-9, at 2.

25

To settle their dispute, International Paper agreed to pay Stimson $37,500.

Dkt. 37-9, ¶ 1.  In consideration for that payment, Stimson agreed to the following

release provision:

> ... Stimson...does hereby release, forever quitclaim and discharge
> [International Paper], its agents, servants, employees, successors, and
> assigns from any and all liability, claims, demands, damages, costs, actions,
> or causes of action, or expenses, of every kind and nature whatsoever for, on
> account of, arising under, or related to the Dispute, both as to matters and
> things now known and also as to matters and things hereinafter discovered,
> if any.

Dkt. 37-9, ¶ 2.

The 2005 Agreement further states:

> It is understood and agreed that this Agreement hereby extinguishes all
> claims or rights which Stimson had, has or might have against [International
> Paper] arising out of or related to the Dispute....

Dkt. 37-9, ¶ 4.

International Paper reads this release as a general one, by which Stimson

gave up "any and all future claims related to [its prior indemnification] claims *and*

to contamination from petroleum products and hydrocarbons and for past handling

of solid or hazardous wastes."  Dkt. 35, at 17 (emphasis in original).   To the

extent International Paper suggests that Stimson gave up any and all future claims

it might have "concerning the presence of petroleum products and hydrocarbons

on and under the Mill property" or "for past handling of hazardous and/or solid

26

waste generated at the Bonner Mill," regardless of whether or not those future claims were related to the Dispute, International Paper is mistaken.

The release makes clear that Stimson intended to release International Paper from all claims – known or unknown – "arising under, or related to the Dispute." The 2005 Agreement in turn specifies that "the Dispute" was with respect to Stimson's "indemnification claims." Dkt. 37-9, at 2. It is thus apparent that Stimson agreed to give up only those future claims that could be said to arise under, or relate to, its previously disputed indemnification claims.

According to International Paper, Stimson's CERCLA and CECRA claims are barred in their entirety even under this more limited reading of the release because they are substantively "related to" the previously disputed indemnification claims. In International Paper's view, this is so because "the PCB and petroleum contamination in the cooling pond are 'related to' the Dispute, *i.e.*, the contamination in the Fire Pond Lagoon and East Log Track area that was the subject of the indemnification claims previously asserted by Stimson." Dkt. 35, at 19.

While International Paper argues that the 2005 Agreement is unambiguous and resort to extrinsic evidence would be improper, it describes "the Dispute" in a way that can only have come from extrinsic evidence – as one involving "the

contamination in the Fire Pond Lagoon and East Log Track area." Dkt. 35, at 19.

Nowhere in the 2005 Agreement is there any mention of the Fire Pond Lagoon or

East Log Track area.  As International Paper's own argument reflects, it is only by

referencing extrinsic evidence, such as Stimson's letters requesting

indemnification and International Paper's response, that the precise nature of those

claims can be ascertained.

The 2005 Agreement's description of the dispute and underlying

indemnification claims is so vague as to be ambiguous.  It is not possible to

determine based on the text of the 2005 Agreement alone whether or not Stimson's

CERCLA and CECRA claims are so related to the previously disputed

indemnification claims as to be barred.   Because those indemnification claims are

not adequately defined, the 2005 Agreement is ambiguous on this point.  *See e.g.*

*Kim v. Doe*, 890 N.Y.S.2d 250, 251-52 (N.Y. Sup. App. 2009) (concluding that

undefined term rendered release ambiguous).  Where, as here "contract language is

ambiguous, extrinsic evidence is relevant to the extent it bears on the parties'

objective manifestations of intent."  *In re Holocaust Victims Assets Litigation*,

256 F. Supp. 2d 150, 153 (E.D.N.Y 2003).

Both parties have submitted extrinsic evidence bearing upon the nature of

Stimson's earlier claims, including Stimson's letters requesting indemnification

28

and International Paper's response.  Dkt. 37-7, 37-8, 51-3.  Stimson provided

notice of its first claim in August 2002.  Dkt. 37-8.  Stimson explained that "[a]n

oily sheen ha[d] been observed in the lagoon," and "[d]ebris near the mill's dam

ha[d] also been revealed."  Dkt. 37-8.  Stimson advised International Paper that, by

all appearances, "the oily sheen and debris predate[d] the mill purchase."  Dkt. 37-

8.  Stimson requested indemnification pursuant to Paragraph 13.2 of the 1993

Agreement for "its costs and claims that may be made" by the Environmental

Protection Agency.  Dkt. 37-8.

Stimson sent International Paper notice of its second claim for

indemnification approximately one year later, in July 2003.  Dkt. 37-7.  Stimson

stated that workers at the Bonner Mill site had "noticed an oily substance on the

ground surface about 100 feet inside the east log yard gate."  Dkt. 37-7.  Using a

backhoe, Stimson discovered "[a]t least one concrete tank" and removed "about 20

yards of petroleum-contaminated soil."  Dkt. 37-7.  Stimson determined that a

larger rig would be required "to remove the tank(s) and contaminated soil."  Dkt.

37-7.  Stimson notified the State of Montana, and sought indemnification from

International Paper "for its costs and claims that may be made by the state of

Montana."  Dkt. 37-7.

In responsive correspondence dated November 2, 2004, International Paper

29

agreed that Stimson's "claims for the fire pond lagoon and the east log yard appear to be covered by the indemnity [provisions of the 1993 Agreement], while the claim regarding ash management does not." Dkt. 51-3, at 2. Apparently, "both of these investigations and cleanups [were] accepted into Montana's Petroleum Tank Release Compensation Fund ("Tank Fund") for reimbursement." Dkt. 51-3, at 2. International Paper agreed to pay the Tank Fund cleanup contribution of $35,000 for Stimson's "Fire Pond Lagoon and East Log Yard Claims." Dkt. 51-3. But International Paper refused to pay the penalty imposed by the Montana Department of Environmental Quality for management of boiler ash. Dkt. 51-3, at 3.

As this correspondence reflects, the indemnification claims resolved by way of the 2005 Agreement arose out of environmental contamination in the fire pond lagoon and east log yard areas at the Bonner Mill, and from management of boiler ash. Unlike those claims, Stimson's current claims arise out of environmental contamination detected in Bonner Mill's cooling pond. Dkt. 1, ¶ 15. On their face, Stimson's CERCLA and CECRA claims have nothing to do with recovering cleanup costs associated with remediating contamination at the fire pond lagoon or east log yard.

International Paper nevertheless argues that Stimson's statutory claims are

sufficiently related to its prior indemnification claims so as to be barred in their

entirety by the terms of the 2005 Agreement's release.  In doing so, International

Paper looks primarily to the Administrative Order on Consent ("AOC") and "Final

Cooling Pond Removal Work Plan, Bonner Mill Cooling Pond and Vicinity"

("Work Plan") that outline the scope of the proposed cooling pond cleanup work.

Dkt. 37-2, 37-3 through 37-5.  For example, International Paper notes that the

AOC defines the "Cooling Pond Area" to be remediated as including the "fire

pond" and "east log track areas."  Dkt. 37-2, at 6, ¶ 21.  International Paper also

points to the fact that the Work Plan describes the objectives of the proposed work

to include "[r]emediat[ing] (via excavation and off-site disposal) PCB and

petroleum-impacted soil and materials within the cooling pond, berm, and

surrounding areas including the former Fire Pond Lagoon area and the East Log

Track area."  Dkt.37-3, at 6.  According to International Paper, these excerpts

demonstrate that the cooling pond cleanup work for which Stimson is seeking

contribution is substantively and geographically "related to" the 2006 petroleum

and hydrocarbon cleanup work it performed at the Fire Pond Lagoon.

　　　As International Paper also notes, the AOC describes the previous Fire Pond

Lagoon cleanup and indicates that "[s]ome petroleum free product containing

PCBs remains" in the area, although the extent of the contamination in that area

has not yet been determined.  Dkt. 37-2, at 9, ¶ 36.  Elsewhere, the Work Plan specifically advises that the "fire pond lagoon and east log track area" materials to be excavated may be subject to the previous Tank Fund action associated for those areas.  Dkt. 37-3, at 5.  International Paper reads these excerpts to show that the cooling pond cleanup work giving rise to Stimson's CERCLA and CECRA claims is sufficiently "related to" its prior indemnification claims so as to be barred by the 2005 Agreement's release provision.

These record excerpts do suggest that some components of the remedial action to be performed at the cooling pond may take place in the same geographic vicinity as Stimson's prior remedial work at the Fire Pond Lagoon, and may to an extent involve materials associated with those prior remedial efforts.  *See e.g.* 37-2, at 18¶ 74.  But the fact that some portion of the cleanup outlined in the AOC and Work Plan may take place where the prior Tank Fund cleanup was carried out, or involve materials associated with those prior remedial efforts, does not necessarily mean that Stimson's current statutory claims are so "related to" its prior indemnification claims as to be barred in their entirety.

Much of the work contemplated by the AOC and Work Plan will take place not at the Fire Pond Lagoon or East Log Yard where the prior cleanup took place, but at that portion of the Bonner Mill known as the "Cooling Pond."   Dkt. 37-2, ¶

20.   Because a significant portion of the cleanup work delineated in the AOC and

Work Plan is not related to cleaning up the Bonner Mill's Fire Pond Lagoon or

East Log Yard, this Court cannot say as a matter of law that Stimson's statutory

claims are so related to its prior indemnification claims as to be barred in their

entirety by the 2005 Agreement's release language.

International Paper maintains that "Stimson cannot parse the AOC cleanup

from the earlier cleanup that resulted in its release," and does not ask the Court to

do so either.  Dkt. 56, at 15.  International Paper instead argues that the Court

should simply dismiss Stimson's CERCLA and CECRA claims in their entirety.

But because much of the cleanup work contemplated by the AOC and Work Plan

has nothing to do with environmental contamination in the Fire Pond Lagoon or

East Log Yard, the Court cannot say as a matter of law that Stimson's current

claims are so related to its prior indemnification claims as to be barred in their

entirety.  The Court expresses no opinion as to whether or not certain portions of

Stimson's CERCLA and CECRA claims might be "related to" the indemnification

claims settled by way of the 2005 Agreement.  For present purposes, the material

distinctions between the statutory claims Stimson advances in this case and its

prior indemnification claims are enough to defeat International Paper's summary

judgment motion.  Because International Paper has not met its threshold burden of

showing that it is entitled to judgment as a matter of law,  International Paper's motion to summarily dismiss Stimson's statutory claims in their entirety on the ground that they are barred by the 2005 Agreement should be denied.

**B.    Motion for Summary Judgment Regarding Joint and Several Liability**

International Paper also moves for summary judgment to the extent that Stimson's First, Third, and Fourth claims for relief seek to hold it jointly and severally liable under § 107(a) of CERCLA and CECRA, § 75-10-715, for all the response costs Stimson has incurred, and will incur, performing cleanup work pursuant to the Administrative Order on Consent.  International Paper argues that neither CERCLA nor CECRA supports such a claim for joint and several liability where the party incurring environmental remediation costs does so pursuant to an administrative or judicial settlement or order.

1.    <u>CERCLA</u>

CERCLA provides two distinct remedies by which responsible private parties may recover some or all of their hazardous waste cleanup costs:  (1) cost recovery claims under § 107(a), 42 U.S.C. § 9607, and; (2) contribution claims under § 113(f), 42 U.S.C. § 9613.  One significant distinction between these two remedies is that a defendant in a § 107 cost recovery action will be held jointly and severally liable for all response costs unless it can show there is a reasonable basis

34

for apportionment, while a defendant in a § 113(f) contribution action is liable only for its equitable share of those costs.  *See Burlington Northern v. Santa Fe Ry. Co. v. United States*, 129 S.Ct. 1870, 1880-81 (2009); 42 U.S.C. § 9613(f)(1).

Stimson is pursuing both avenues of relief in this case.   In its First Claim for Relief, Stimson seeks to hold International Paper jointly and severally liable under § 107(a) for all response costs.  Alternatively, Stimson asserts it is entitled to contribution from International Paper for its response costs under § 107(a).  Dkt. 1, ¶¶ 20-29.  Stimson alleges in its Second Claim for Relief that it has paid more than its equitable share of response costs, and seeks contribution from International Paper pursuant to § 113(f).  Dkt. 1, ¶¶ 20-29; 31-33.   Stimson also seeks a declaratory judgment under 28 U.S.C. § 2201, asking that the Court declare International Paper jointly and severally liable under CERCLA § 107(a) for any and all remediation and response costs, or alternatively, declare that International Paper is liable under CERCLA § 113(f) for an equitable share of those costs.  Dkt. 1, ¶¶ 41-49.

International Paper does not dispute that Stimson may seek contribution under § 113(f)(3)(B),[5] but moves for summary judgment to the extent Stimson

---

[5] Section 113(f)(3)(B) authorizes a PRP like Stimson to seek contribution from other PRPs where it has "resolved its liability to the United States or a State...in an administrative or judicially approved settlement...."  International Paper agrees that because Stimson resolved its CERCLA liability to State of Montana in the

35

seeks to hold it jointly and severally liable for all past and future response and

remediation costs under § 107(a).   Because Stimson is incurring its cleanup costs

pursuant to an administrative settlement, International Paper maintains that § 113(f)

provides Stimson's exclusive remedy.

International Paper begins by citing *United States v. Atlantic Research,* 551

U.S. 128, 131 (2007), in which the United States Supreme Court overruled lower

court precedent holding that PRPs could never have a claim under § 107(a), and

clarified that § 107(a) may provide PRPs "with a cause of action to recover costs

from other PRPs."  In reaching that determination, the Court reiterated that §

107(a) and § 113(f) "provide two 'clearly distinct' remedies" which "complement

each other by providing causes of action 'to persons in different procedural

circumstances.'"  *Atlantic Research*, 551 U.S. at 138-39 (citation omitted).  As the

Court explained it, a PRP that incurs response costs directly may have a cause of

action against another PRP under § 107(a), but a PRP that simply reimburses

response costs paid by other parties "has not incurred its own costs of response and

therefore cannot recover under § 107(a)."  *Atlantic Research*, 551 U.S. at 139.

While a PRP incurring reimbursement costs would be eligible to seek contribution

under § 113(f), it could not "simultaneously seek to recover the same expenses

--------

Administrative Order on Consent, it is entitled to seek contribution under § 113(f).

under § 107(a)." *Atlantic Research*, 551 U.S. at 139.  Noting that a PRP in that

situation "could not avoid § 113(f)'s equitable distribution of reimbursement costs

among PRPs by instead choosing to impose joint and several liability on another

PRP in an action under § 107(a)," the Court wrote that "[t]he choice of remedies

simply does not exist." *Atlantic Research*, 551 U.S. at 140.

As Stimson and International Paper both recognize, however, *Atlantic*

*Research* did not answer the precise question with which this Court is now faced –

whether a PRP like Stimson who incurs costs in performing a cleanup pursuant to

an administrative settlement is limited to a contribution remedy under § 113(f) or is

entitled to also seek cost recovery under § 107(a).  The *Atlantic Research* Court

specifically refused to consider whether "compelled costs of response," such as

those incurred pursuant to a consent decree or settlement agreement, "are

recoverable under § 113(f), § 107(a), or both." *Atlantic Research*, 551 U.S. at 139

n. 6.

Although the Ninth Circuit has not yet had occasion to take on this issue in

the wake of *Atlantic Research*,  several other courts have done so with the vast

majority holding that § 107 is not an available remedy when a PRP directly incurs

"compelled" cleanup costs pursuant to a consent decree or settlement agreement

with a governmental agency.  *See e.g. Agere Systems, Inc. v. Advanced*

37

*Environmental Technology Corp.*, 602 F.3d 204, 227-28 (3d Cir. 2010); *Niagara*

*Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 124 (2d Cir. 2010);

*Solutia, Inc. v. McWane, Inc.*, 726 F. Supp. 2d 1316, (N.D. Ala. 2010) (citing

*Agere*, *Niagara*, and several other cases holding that a § 113(f) contribution action

is the exclusive remedy for a PRP who incurs compelled cleanup costs pursuant to

a judgment, consent decree, or settlement agreement, and citing a few district court

cases to the contrary).   Stimson acknowledges that most post-*Atlantic Research*

cases have held that § 107(a) is not an available remedy "when a PRP directly

incurs costs cleaning up a site under a settlement agreement with a governmental

agency," but takes the position that "these cases are wrongly decided and contrary

to the text of CERCLA."  Dkt. 48, at 14.

Notwithstanding Stimson's arguments to the contrary, the Third Circuit's

decision in *Agere* is particularly persuasive.  The plaintiffs in *Agere* brought cost

recovery and contribution claims against the defendants pursuant to §§ 107(a) and

113(f).  *Agere*, 602 F.3d at 210.  The plaintiffs sought to recover costs they had

paid to the Environmental Protection Agency pursuant to certain consent decrees.

*Agere*, 602 F.3d at 210.   The court found that the plaintiffs' claims fell squarely

within "the issue left open in *Atlantic Research:* whether, in addition to § 113(f)

claims, plaintiffs such as these have § 107(a) claims for expenses sustained

38

pursuant to a consent decree following a CERCLA suit." *Agere*, 602 F.3d at 228.

Looking to *Atlantic Research* for guidance, the *Agere* court noted that "immediately after setting forth this unanswered question, and after suggesting that there is, in fact, some 'overlap' between § 107(a) and § 113(f), the Supreme Court stated that 'a defendant PRP in such a § 107(a) [joint and several liability] suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim.'" *Agere*, 602 F.3d at 228 (quoting *Atlantic Research,* 551 U.S. at 140). As the Supreme Court went on to explain, "any fear that 'PRPs will eschew equitable apportionment under § 113(f) in favor of joint and several liability under § 107(a)' is mitigated by the fact that 'a § 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action.'" *Agere*, 602 F.3d at 228 (quoting *Atlantic Research*, 551 U.S. at 138, 40).

In *Agere*, however, the court found that "the potential for an inequitable result" remained because the defendants would have been precluded by virtue of § 113(f)(2) from bringing a § 113(f) counterclaim against the plaintiff. *Agere*, 602 F.3d at 228. Section 113(f)(2) states that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the

39

settlement." *Agere*, 602 F.3d at 228 (quoting 42 U.S.C. § 9613(f)(2)).   Because

the defendants would have been barred from bringing a contribution counterclaim

due to the fact that the plaintiffs had entered into judicially approved settlements

with the EPA, the plaintiffs would have been "able to recover 100 percent of their

own costs against [the defendant], even though they themselves [were] actually

responsible for, and ha[d] stipulated that they [were] responsible for, a significant

portion of the contamination" at the site.  *Agere*, 602 F.3d at 228.

The *Agere* court described that potential result as "perverse" in light of the

fact that "a primary goal of CERCLA is to make polluters pay."  *Agere*, 602 F.3d at

228.  The court thus held that plaintiffs "who if permitted to bring a § 107(a) claim

would be shielded from contribution counterclaims under § 113(f)(2), do not have

any § 107(a) claims for costs incurred pursuant to consent decrees in a CERCLA

suit." *Agere*, 602 F.3d at 229.

Here, as in *Agere*, Stimson is protected from contribution counterclaims by

virtue of § 113(f)(2) and the terms of its agreement with the Montana Department

of Environmental Quality.  Stimson agrees that the AOC constitutes an

administrative settlement under § 113(f)(3)(B), and that contribution would not be

available to International Paper.   Dkt. 48, at 26.  This means that if Stimson were

allowed to pursue a § 107(a) claim for joint and several liability, International

Paper would be precluded from pursuing the § 113(f) contribution counterclaim it has asserted.  Dkt. 54, at 15-17.  Thus, the concern voiced by the court in *Agere* is present here as well.  Were Stimson able to proceed under § 107(a), it could stand to recover 100 percent of its compelled response costs from International Paper, who would not be able to bring a § 113(f) counterclaim in an effort to "blunt any inequitable distribution of costs...."  *Atlantic Research*, 551 U.S. at 140.

Stimson counters with a policy argument of its own, and maintains for various reasons that "the concerns of unfairness that motivated the *Agere* court are overstated."  Dkt. 48, at 26.  First of all, Stimson maintains that joint and several liability is not a foregone conclusion in an action under § 107(a) because courts still have the ability to allocate responsibility among PRPs.  *See Burlington Northern and Santa Fe Railway Co. v. United States*, — U.S. —, 129 S.Ct. 1870, 1880-81 (2009).

While it is true that a defendant may seek to avoid joint and several liability under § 107(a), to do so it must prove "that a reasonable basis for apportionment exists."  *Burlington Northern*, 129 S.Ct. at 1881.   "Not all harms are capable of apportionment however," and "[w]hen two or more causes produce a single, indivisible harm, courts have refused to make an arbitrary apportionment...."  *Burlington Northern*, 129 S.Ct. at 1881.  And significantly, courts do not take

41

equitable considerations into account in the apportionment analysis. *Burlington Northern*, 129 S.Ct. at 1882. "[R]ather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by PRPs." *Burlington Northern*, 129 S.Ct. at 1882.

This is quite unlike allocation in the context of a § 113(f) contribution claim, where courts are bound to consider equitable factors. While a defendant seeking to avoid joint and several liability in a proceeding under § 107(a) bears a heavy burden, in a § 113(f) contribution proceeding, it is the plaintiff who bears the burden of proving the defendant's equitable share of costs. *See e.g. United States v. Davis*, 261 F.3d 1, 47 (1st Cir. 2001); *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 78 (1st Cir. 1999). In light of these differences, it is not surprising the *Atlantic Research* Court described a § 113(f) counterclaim as an effective method of blunting any inequitable distribution of costs, but did not say the same with respect to the fact that a defendant in a § 107(a) proceeding may attempt to escape joint and several liability.

Stimson also makes what amounts to a policy argument. As Stimson points out, if it had not entered into the AOC, and had simply cleaned up the site on its own without any input from the Montana DEQ, then it would have been able to hold International Paper jointly and severally liable under § 107. Stimson argues

42

the Court should not penalize it for coming to an agreement with the Montana

DEQ, and that limiting settling plaintiffs to contribution claims under § 113(f)

would discourage parties from entering agreements with the states to ensure proper

cleanup.  Dkt. 48, at 16-17.

As discussed above, however, a PRP like Stimson that chooses to settle with

a governmental agency stands to gain something in return – statutory protection

from contribution claims under § 113(f)(2).   To allow a contribution-protected,

settling PRP to then impose joint and several liability on another PRP might well

mean that the settling PRP could escape paying anything at all.  And as

International Paper points out, the reality is that a party with only a claim for

contribution is not left with any lesser remedy than a party who has a § 107 claim

for cost recovery.   This is so because parties who overreach with their § 107 cost

recovery claims in an attempt to recover more than their fair share of

reimbursement invariably face the blunting effect of § 113 counterclaims, which

effectively eliminate joint and several liability.  *See Kotrous v. Goss-Jewett Co.*,

523 F.3d 924, 933 (9th Cir. 2008) (explaining that "any of the defendants sued by

such a PRP may seek contribution under § 113(f) because they now will have been

subject to an action under § 107").  A settling PRP with a § 113(f) contribution

claim will bear its own share of liability, and recover contribution from other PRPs

43

for their respective shares.  This fits with Congress's directive, which is for courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).

The sole post-*Atlantic Research* case on which Stimson relies for the proposition it should be entitled to seek relief under both § 107(a) and 113(f) is distinguishable.  *Ford Motor Co. v. Michigan Consolidated Gas Company*, 2009 WL 3190418 (E.D. Mich 2009).   The court in that case allowed the plaintiffs to pursue a claim for their own direct response costs under § 107(a), but found that because the state administrative order at issue did not constitute an administrative settlement under CERCLA, the plaintiffs could not maintain a § 113(f) contribution action.  *Ford Motor Co.*, 2009 WL 3190418 *7-8.  In allowing the plaintiffs to move forward with their claim under § 107, the court agreed that "[t]o disallow a party who has entered into a consent order with an administrative agency to seek recovery of expenditures from other PRPs would discourage cooperation with state agencies."  *Ford Motor Co.*, 2009 WL 3190418 * 8 (quoting *W.R. Grace & Co. – Conn. v. Zotos Intern., Inc.*, 559 F.3d 85, 95 (2d Cir. 2009).  The court found "that recoverable costs under § 107 are not necessarily limited to those voluntarily incurred."  *Ford Motor Co.*, 2009 WL 3190418 * 9.

It is not possible to tell, however, whether the plaintiffs in *Ford Motor* had

contribution protection under § 113(f)(2), as Stimson does.  Furthermore, the *Ford Motor* court took care to reconcile its decision with that of the district court in *ITT Industries, Inc. v. BorgWarner, Inc.*, 615 F. Supp. 2d 640 (W.D. Mich 2009), which had just ruled that "if a party is seeking costs incurred pursuant to a judicial or administrative settlement and those costs could have been sought under § 113(f)...[then] that party cannot maintain a suit under § 107." *Ford Motor*, 2009 WL 3190418 * 7 n. 4.  Because the plaintiffs in *Ford Motor* did not have a cause of action under § 113(f), the court observed that they would have been "allowed to maintain their § 107 claim" even under the *ITT Industries* court's ruling.  The same cannot be said here – Stimson does have a cause of action under § 113(f), and because of that, cannot maintain a suit under § 107.

Because § 113(f) provides Stimson's exclusive remedy, International Paper's motion for summary judgment as to Stimson's First and Fourth claims for relief, to the extent those claims seeks to hold International Paper jointly and severally liable under § 107(a) of CERCLA, should be granted.

2.   <u>CECRA</u>

Stimson's third claim for relief alleges that International Paper "is jointly and severally liable for remedial action costs" under Mont. Code Ann. § 75-10-724. Dkt. 1, ¶ 40.  Stimson also seeks a declaratory judgment to that effect.  Dkt. 1, ¶

45

47.

International Paper moves for summary judgment to the extent Stimson seeks

to hold it jointly and severally liable under CECRA on the ground that § 724 limits

recovery by responsible parties like Stimson to claims for contribution.   CECRA §

724 provides as follows:

> **Private right of action.**  Any person who receives notice under 75-10-711,
> who is held jointly and severally liable under 75-10-715, or who initiates a
> voluntary cleanup under the provisions of 75-10-730 through 75-10-738 may
> bring a private right of action, including a claim for contribution or
> declaratory relief, against any other person who is liable or potentially liable
> under 75-10-715 for the recover of remedial action costs.  In resolving
> contribution claims, the court shall allocate remedial action costs among the
> liable persons based on the factors set out in 75-10-750.

Mont. Code Ann. § 75-10-724.

On its face, § 724 thus allows a responsible party to seek contribution or

declaratory relief from other potentially responsible parties, but says nothing about

authorizing a claim for joint and several liability.  Because Stimson "is being held

jointly and severally liable for costs of cleanup of the contamination at the Site,"[6]

International Paper maintains that its only right of action under CECRA is a claim

for contribution.

The plain language of § 724 supports International Paper's position, and

Stimson does not argue otherwise.  Stimson has not responded to this portion of

_____

[6] Dkt. 1, ¶ 38.

International Paper's motion at all.  Stimson does not challenge International Paper's reading of § 724, which authorizes responsible parties to seek contribution or declaratory relief.   Because § 724 does not provide for joint and several cost recovery, and Stimson does not argue otherwise, Stimson's third claim for relief should be summarily dismissed to the extent it seeks to hold International Paper jointly and severally liable for cleanup costs under CECRA.

**IV.   Conclusion**

Based on the foregoing,

IT IS RECOMMENDED that International Paper's motion for summary judgment that Stimson's claims are barred by contract be DENIED and its alternative motion for summary judgment on Stimson's claims of joint and several liability be GRANTED.

DATED this 28th day of February, 2011

 /s/ Jeremiah C. Lynch                              
Jeremiah C. Lynch
United States Magistrate Judge